UNITED STATES DISTRICT COURT                 b

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | |
|---|---|
| TERRENCE PAUL GUILLORY | CIVIL ACTION NO. 2:16-CV-01721 |
| VERSUS | JUDGE TRIMBLE |
| CAROLYN W. COLVIN[1] | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

I.   Background

A.   Procedural Background

Terrence Paul Guillory ("Guillory") filed an application for disability insurance benefits ("DIB") on May 28, 2015, alleging a disability onset date of November 1, 2014 (Doc. 6-1, p. 139/495) due to reactive airway disease, tinnitus, post-traumatic stress disorder ("PTSD"), and a skin disorder (Doc. 6-1, p. 167/495).  That application was denied by the Social Security Administration ("SSA") (Doc. 6-1, p. 87/495).

A *de novo* hearing was held before an administrative law judge ("ALJ"), at which Guillory appeared with his attorney and a vocational expert ("VE") (Doc. 6-1, p. 42/495).  The ALJ found that, although Guillory has severe impairments of eczema, asthma, and anxiety/PTSD, he has the residual functional capacity to do sedentary work that is unskilled, does not entail exposure to heat, odors, gases, fumes, or poorly

---

[1] Nancy Berryhill replaced Carolyn Colvin as Acting Commissioner on January 23, 2017.

ventilated areas, and does not require him to interact or communicate with the public (Doc. 6-1, pp. 16, 19/495).  The ALJ also found there are jobs existing in significant numbers in the economy that Guillory can perform, such as document specialist (DOT 249.587.018, sedentary, SVP 2, 73,000 jobs in the national economy) (Doc. 6-1, p. 26/495).  The ALJ concluded that Guillory was not disabled, as defined in the Social Security Act, from November 1, 2014 through the date of her decision on July 25, 2016 (Doc. 6-1, pp. 25-26/495).

Guillory requested a review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 6-1, p. 4/495).  The ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Guillory next filed this appeal for judicial review of the Commissioner's final decision.  On appeal, Guillory contends the Appeals Council erred in declining to review the ALJ's decision because Guillory submitted new and material medical evidence that created doubt as to whether the ALJ's decision was supported by substantial evidence (Doc. 7).

The Commissioner filed a response to Guillory's appeal (Doc. 12)   Guillory's appeal is now before the Court for disposition.

### B.    <u>Medical Records</u>

Guillory served in the United States Navy, the United States Navy Reserve, and the National Guard (Doc. 6-1, p. 185/495).  Beginning April 1, 2012, Guillory received VA benefits for service-connected PTSD and unspecified depressive disorder, which were found to be 70% service-connected (Doc. 6-1, pp. 232, 236/495).

In March 2012, the VA listed Guillory's problems as: dyspnea (shortness of breath); asthma, unspecified; depression, NOS; anxiety disorder; nicotine dependence; PTSD; and unspecified housing or economic circumstance (Doc. 6-1, pp. 258/495).

In December 2012, Guillory's blood pressure was 133/81, he was 71 inches tall, and he weighed 216 pounds (Doc. 6-1, pp. 274, 451/495). Guillory was treated for PTSD, asthma, and an itchy rash on his arms and face (Doc. 6-1, p. 449/495). Guillory reported smoking half a pack of cigarettes per day (Doc. 6-1, p. 450/495). Guillory was taking Albuterol, Budesonide, Doxepin, Prazosin, and sertraline (Doc. 6-1, p. 450/495). Guillory had cracking on both palms and fingers due to eczema (Doc. 6-1, p. 453/495). Guillory also had a two-week old, diffuse, red rash on his face and arms, with some lichenification[2] (Doc. 6-1, pp. 450, 453/495). Guillory's rash was believed to be an allergic reaction and he was prescribed betamethasone and a Decadron Dose Pak (Doc. 6-1, p. 451/495). Guillory was strongly urged to stop smoking due to his asthma (Doc. 6-1, p. 451/495).

In January 2013, Guillory reported his rash had resolved with the medication, but returned on his back, wrist, buttocks, and both legs, and he developed boils (Doc. 6-1, p. 448/495). By February the rash was widespread and inflamed (Doc. 6-1, p. 442/495). Guillory was prescribed Cipro (Doc. 6-1, p. 442/495). A week later, the rash

---

[2] Lichenified means the skin has become thickened and leathery. See MedlinePlus Health Information, Medical Encyclopedia: Lichenified, *available at* https://medlineplus.gov/ency/article/003251.htm (a service of the U.S. National Library of Medicine and the National Institutes of Health).

was improved but not completely gone (Doc. 6-1, p. 437/495).  It was determined the rash was probably a reaction to exposure to some chemical at work (Doc. 6-1, p. 437/495).

In February 2013, during counseling, Guillory reported his PTSD and anxiety medications were not working; he was under a lot of stress; he was not able to relax or enjoy things; he had quit his job because he was allergic to something in that workplace; he was struggling with school and his grades were not good; and he had filed for bankruptcy (Doc. 6-1, p. 442/495).  Guillory had also signed up for another 6 years with the National Guard (Doc. 6-1, p. 442/495).  Guillory showed continued improvement in his PTSD symptoms (Doc. 6-1, p. 443/495).  His appearance, speech, eye contact, posture, orientation, thoughts, affect, memory, concentration, judgment and insight were good, but his mood was anxious (Doc. 6-1, p. 443/495).

A mental status exam in March 2013 showed Guillory was so hypervigilant at night that he fought against his sleep meds, so his medications were changed (Doc. 6-1, p. 433/495).  Guillory's mood was irritable, and his affect was restricted in range (Doc. 6-1, p. 434/495).  Guillory was diagnosed with depression, anxiety, and PTSD at Axis I, and a GAF of 65 at Axis V[3] (Doc. 6-1, p. 434/495).  Guillory's Zoloft was

---

[3] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning.  See Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").  A GAF of 51 to 60 indicates moderate symptoms, or moderate difficulty in social, occupational, or school functioning; and a GAF of 61-70 indicates some mild symptoms or some difficulty in social, occupational or school functioning, but generally functioning pretty well and has some meaningful interpersonal relationships.  See DSM-IV-TR, at 34; see also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).  In the more recent fifth edition

increased, his Prazosin and Doxepin were continued, and Klonopin was started (Doc. 6-1, p. 434/495).

In May 2013, Guillory again reported anxiety due to life-changing events: his grandfather, which whom he was very close, passed away; his home had burned down the month before; he and his family stayed in several different places for a month until they found a new place; and he was dismissed from school for failure to complete assignments due to lack of a computer for that month (Doc. 6-1, p. 430/495).  However, Guillory said he would be able to resume classes (Doc. 6-1, p. 430/495).  It was noted that Guillory was coping adequately with these challenges (Doc. 6-1, p. 430/495).

In July 2013, Guillory reported stress due to moving and problems sleeping, and admitted he had been out of Zoloft and Klonopin for a week and had not been taking his sleep medicine (Doxepin) because there was so much going on and it made him tired (Doc. 6-1, p. 426/495).  Klonopin was helping Guillory's irritability (Doc. 6-1, p. 426/495).  Guillory's mood was "down" and his affect was constricted (Doc. 6-1, p. 426/495).  Dr. Victor B. Bush, a psychiatrist, found Guillory had not been compliant with his medications, he was still dealing with the loss of his home in a fire, and his relationship with his wife was strained (Doc. 6-1, p. 427/495).  Guillory was then 30 years old (Doc. 6-1, p. 428/495).  Dr. Bush diagnosed depression, PTSD, and anxiety at Axis I; and a GAF of 60 at Axis V (Doc. 6-1, p. 427/495).  Dr. Bush decreased Guillory's Doxepin and continued his other medications (Doc. 6-1, p. 427/495).

---

DSM-V, a non-axial system of evaluation was adopted, and GAF scoring was discontinued.  See Diagnostic and Statistical Manual of Mental Disorders, p. 16 (5th ed. 2013).

In August 2013, Guillory's mood was still a little down and his affect constricted, he was compliant with treatment, he continued to have poor sleep and a depressed mood, and his anxiety was triggered by financial stressors (Doc. 6-1, p. 423/495). Dr. Bush again found Guillory's GAF was 60 (Doc. 6-1, p. 423/495). Guillory's Doxepin was discontinued and Hydroxyzine was prescribed (Doc. 6-1, p. 423/495).

In September 2013, Guillory's restrictive lung disease and reactive airway dysfunction (diagnosed in April 2012) were evaluated (Doc. 6-1, p. 418/495). It was noted that Guillory had childhood asthma, was a current half-pack per day smoker, and had been exposed to dust, smoke, and other irritants in the Gulf War (Doc. 6-1, p. 418/495). Due to his lung disease, Guillory required intermittent inhalational bronchodilator therapy, intermittent use of inhalational anti-inflammatory medication, intermittent use of an oral bronchodilator, and antibiotics (Doc. 6-1, p. 418/495). Guillory's pulmonary function report was normal (pre-bronchodilator FEV-1/FVC of 80% and post-bronchodilator FEV-1/FVC of 84%) (Doc. 6-1, pp. 418-19/495). Guillory's mid-expiratory flow rates FEF were 25-75%, 62% suggestive of small airway disease (Doc. 6-1, p. 419/495). Guillory's small airway disease was found likely to be related to exposure events in Southwest Asia, since the onset of his respiratory symptoms was during his Gulf War deployment (Doc. 6-1, p. 419/495). Meter-dose inhalers were recommended (Doc. 6-1, p. 419/495).

In October 2013, Guillory's mood and affect were anxious (Doc. 6-1, p. 416/495). Guillory explained he draws and paints, and plans to get an airbrush (Doc. 6-1, p.

416/495).   Guillory lives with his wife and her four children, and his wife recently began working, which helped with the family finances "tremendously" (Doc. 6-1, p. 416/495). Guillory reported medication compliance (Doc. 6-1, p. 416/495).

In November 2013, Guillory's mood and affect were anxious, but he showed improvement in his ability to manage his anger and his PTSD symptoms (Doc. 6-1, p. 415/495). Guillory reported stress and anger which appeared to emanate from family issues and the holiday season (Doc. 6-1, p. 414/495). Guillory admitted he had not been taking his medications, in part because they had been changed and he was waiting for the new ones to arrive (Doc. 6-1, p. 414/495). Guillory and his wife agreed to take the children in for counseling, also (Doc. 6-1, p. 414/495), which they did in December (Doc. 6-1, pp. 412-13/495).

In January 2014, Guillory said he was discouraged about his children's behavior and felt misunderstood by his wife (Doc. 6-1, p. 411/495). Guillory admitted he had never receive his medications and had not taken any in about 6 weeks, so the doctor's office re-ordered them (Doc. 6-1, p. 411/495). When he still had not received his medications two weeks later, it was discovered they were being mailed to his old post office box and the Post Office had the packages (Doc. 6-1, p. 410/495).

In February 2014, Guillory's blood pressure was 124/82 and he weighed 221 pounds (BMI 35) (Doc. 6-1, pp. 267, 399/495). In his PTSD reassessment, Guillory reported having repeated disturbing memories, thoughts, or images "quite a bit;" repeated disturbing dreams–a little bit; suddenly feeling as if the stressful experience was happening again–moderately; feeling very upset when something reminds him

of the stressful experience–quite a bit; having physical reactions when something reminds him of the stressful experience–quite a bit; avoiding thinking about or having feeling related to the stressful experience–extremely; avoiding activities of situations that remind him of the stressful experience–extremely; loss of interest in activities he used to enjoy–quite a bit; feeling distant or cut off from others–moderately; feeling emotionally numb–moderately; feeling as hit his future will somehow be cut short–moderately; trouble falling or staying asleep-extremely; feeling irritable or having angry outbursts–extremely; having difficulty concentrating–quite a bit; being "super-alert," watchful, or on guard–extremely; and feeling jumpy or easily startled–extremely (Doc. 6-1, pp. 401-02/495). These things had made it very difficult for Guillory to work, take care of things at home, or get along with others (Doc. 6-1, p. 402/495). Guillory was noted to be compliant with his medications (Doc. 6-1, p. 403/495). Dr. Bush diagnosed PTSD, depression, and anxiety, prescribed (restarted) Klonopin, and continued Guillory's other medications (Doc. 6-1, p. 403/495).

In March 2014, Guillory felt like he was doing pretty well with managing his PTSD symptoms, and discussed ways to improve anger management (Doc. 6-1, p. 397/495). Guillory had been promoted within the National Guard (Doc. 6-1, p. 397/495).

In April 2014, Guillory again reported medication noncompliance, increased anxiety, and less patience (Doc. 6-1, p. 396/495). Guillory agreed to be less reactionary with the children (Doc. 6-1, p. 396/495).

8

In May 2014, Guillory accepted a job as a cook, working offshore with a catering service (Doc. 6-1, p. 391, 393/495).  He was medication compliant and sleeping well (Doc. 6-1, p. 393/495).  Guillory was smoking one pack per day (Doc. 6-1, p. 393/495). Guillory was stable overall (Doc. 6-1, p. 393/495).

In June 2014, Guillory returned from his offshore job early due to his wife's grandmother's declining health, and never returned to work because the job had worsened the condition of his hands, which burned and itched (Doc. 6-1, p. 390/495). Guillory also reported he was not able to take his medications as prescribed while offshore and became quite agitated, but was able to resume medication compliance when he returned home, which helped (Doc. 6-1, p. 390/495)..

In August 2014, Guillory's rash had spread to his trunk (Doc. 6-1, p. 385/495). Dr. John Carrington, a dermatologist, diagnosed chronic contact dermatitis, causing erythema and confluent eczema on Guillory's hands and arms, and eczematous patches on his trunk (Doc. 6-1, p. 385/495).  Guillory was prescribed prednisone, fluocinonide ointment, and CeraVe topical cream (Doc. 6-1, p. 385-86/495).

Also in August 2014, Guillory was advised to stop smoking due to his reactive airway disease, but Guillory said he was not ready to do so (Doc. 6-1, p. 381/495). Guillory was also told to change jobs because his eczema is incurable (Doc. 6-1, p. 380-81/495).  Guillory stated the eczema made it impossible to fulfill his duties at drill with the National Guard, where he was a cook (Doc. 6-1, pp. 373, 375, 379/495). Guillory began the process for a medical retirement from the National Guard (Doc. 6-1, pp. 369, 373/495).  At his psychotherapy appointment, Guillory reported his 14 year

9

old step-daughter had been kidnapped for about 20 hours by a 19 year old and raped (Doc. 6-1, p. 379/495). The man was arrested and Guillory stated he was willing to leave him to the justice system (Doc. 6-1, p. 379/495). In September 2014, the family underwent counseling for the traumatic event (Doc. 6-1, pp. 371-72/495).

In October 2014, Guillory reported he was working for a road construction company, but being on his feet twelve hours per day caused him pain (Doc. 6-1, p. 370/495). He was also having difficulty concentrating on his school work (Doc. 6-1, p. 370/495). His mood and affect were anxious and he was diagnosed with PTSD (Doc. 6-1, p. 371/495). Guillory was also anxious about "medicalling out" of the National Guard (Doc. 6-1, p. 369/495). Guillory's treatment goals were to reduce his anxiety/stress and improve his coping skills (Doc. 6-1, p. 371/495). Guillory stated he took an extra Klonopin on days when his anxiety was worse, which helped, but he was only taking one hydroxyzine per day and was sleeping well (Doc. 6-1, p. 361/495). Dr. Bush reduced Guillory's hydroxyzine and increased his clonazepam (Klonopin) (Doc. 6-1, pp. 361-62/495). Also in October 2014, Dr. James R. Simon, a general practitioner, found Guillory had some wheezing in his right lung (but no dyspnea or tachypnea at rest), and multiple lesions that looked like low grade infections over multiple areas of his skin (Doc. 6-1, p. 357/495). Dr. Simon prescribed Keflex for Guillory's skin problem, and referred him to a pulmonologist for his exertional dyspnea (Doc. 6-1, p. 357/495).

In December 2014, Guillory and his wife were still working (Doc. 6-1, p. 353/495). They were looking for a new home to rent, which was causing stress (Doc.

6-1, p. 353/495). Guillory was looking forward to changing jobs (Doc. 6-1, p. 350/495). Guillory reported his wife had supported him with the children, which made him feel better (Doc. 6-1, p. 350). Guillory had been complaint with his medications (Doc. 6-1, p. 352/495). Dr. Bush diagnosed PTSD and depression, and increased Guillory's clonazepam and continued the other medications (Doc. 6-1, p. 352/495).

In January 2015, Guillory reported breaking out with boils on his torso (Doc. 6-1, p. 349/495). Guillory also had stress from his daughter's hospitalization following statements of intent to commit suicide (Doc. 6-1, p. 345/495). Guillory was found to be using effective coping skills (Doc. 6-1, p. 343/495).

In March 2015, Guillory was packing to move his family again (Doc. 6-1, p. 342). Guillory had turned down a new job because he would not be able to go to his VAMC appointments (Doc. 6-1, pp. 334, 342/495). Guillory hoped to get a job as a cook after he moved (Doc. 6-1, p. 342/495). Later in March, Guillory was adjusting to living with his mother-in-law (to catch up on bills), and was using effective coping skills (Doc. 6-1, pp. 330, 334, 340, 342/495). Dr. Simon found Guillory had several areas on his skin with low grade infection, elevated LDL, and was still smoking (Doc. 6-1, p. 337/495). Guillory was compliant with his medications (Doc. 6-1, p. 334/495).

A March 2015 pulmonary function study showed a greater than 70 % FEV1/FVC ratio (Doc. 6-1, p. 320/495). Guillory's exertional asthma was also evaluated (it was noted he had not kept his 2012 appointments) (Doc. 6-1, p. 334/495). Guillory reported shortness of breath with minimal exertion such as doing household chores, worsening with exercise, and wheezing and coughing when shortness of

breath gets "bad" (Doc. 6-1, p. 319/495). Guillory admitted smoking 5 to 6 cigarettes per day, and that he had started smoking at age 17, averaging 1 pack per day (Doc. 6-1, p. 319/495). Dr. Alexandre Slatkin, a pulmonologist, noted Guillory becomes dyspneic as he walks about a block, wheezes daily (mostly at night), and had not used inhalers for over a year and a half (Doc. 6-1, p. 317/495). Tests suggested a mild airflow obstruction (Doc. 6-1, p. 317/495). Guillory's lungs had bilateral late expiratory wheezes (Doc. 6-1, p. 317/495). Dr. Slatkin diagnosed probable bronchial asthma, moderate and persistent, and prescribed albuterol and Asmanex (Doc. 6-1, p. 317/495).

In April 2015, Guillory reported stress because his mother-in-law had outstanding bills that were jeopardizing her ability to keep her home, where Guillory and his family were staying (Doc. 6-1, p. 315/495). Guillory complained he could not keep a job due to PTSD, and he and his wife were struggling with their relationship (Doc. 6-1, p. 315/495).

Guillory was reevaluated for disability benefits for service-connected PTSD by Gary Futch, Psy. D. in April 2015 (Doc. 6-1, p. 307/495). Guillory reported he completed high school and had earned about two years of college credits, stopping because of difficulties focusing and the death of his wife's grandmother (Doc. 6-1, p. 310/495). Guillory served in the Navy from 2001-05, in the Navy Reserves from 2005-06, and in the National Guard from 2007 to the present, but was trying to retire due to mental health problems, skin disorder, and restricted airway disease (from his Iraq deployment in 2010) (Doc. 6-1, p. 310/495). Guillory had to quit his last two jobs

(construction for four months and lead cook for an offshore catering company) due to his skin condition (Doc. 6-1, p. 310/495).

Two stressor events for Guillory's PTSD were identified: (1) an IED that Guillory failed to find and identify exploded during convoy security, seriously injuring a friend; and (2) Guillory's base was hit by mortar rounds, one in close proximity to him (Doc. 6-1, p. 311/495).   Guillory met the diagnostic criteria for PTSD, which was as likely as not related to his military experiences (Doc. 6-1, p. 314/495).   Guillory was also found capable of managing his own financial affairs (Doc. 6-1, p. 314/495).

Dr. Futch also found Guillory suffers from an unspecified depressive disorder (Doc. 6-1, p. 308/495).   Guillory's score on the Beck Depression Inventory-2 indicated severe depression (Doc. 6-1, p. 306/495).   Dr. Futch stated the symptoms attributable to Guillory's PTSD are recurrent and intrusive distressing recollections of the stressful event; trying to avoid thoughts and conversations associated with the stressful event; getting angry and irritable easily; and exaggerated startle response (Doc. 6-1, p. 308/495).   The symptoms associated with Guillory's depressive disorder are diminished interest in activities that previously gave him pleasure, loss of energy, and feelings of worthlessness (Doc. 6-1, p. 308/495).   Guillory also has occupational and social impairment with reduced reliability and productivity (Doc. 6-1, p. 308/495).   Dr. Futch concluded that Guillory's mental impairments cause occupational and social impairment with reduced reliability and productivity (Doc. 6-1, p. 308/495).

In May 2015, Guillory moved into his parents' home due to problems with his oldest step-daughter (Doc. 6-1, p. 305/495).   Also in May, Guillory was given an overall

80 % service-connected disability rating (70 % for PTSD, 30% for bronchial asthma, and 10% for tinnitus) with increased benefits (Doc. 6-1, p. 294/495).

In August 2015, Guillory underwent a physical exam by Dr. Justin Skweres, a radiologist, at the request of Disability Determination Services (Doc. 6-1, p. 468/495). Guillory complained of a skin disorder (made worse by sweating), reactive airway disease and episodes of significant shortness of breath/chest tightness with mild exertion, left ear hearing loss (related to service as a gunner) and associated tinnitus in that ear, PTSD (diagnosed in 2012), depression, and anxiety (Doc. 6-1, p. 468/495). Guillory also has chest pain related to his reactive airway disease (Doc. 6-1, p. 469/495). Guillory said his legs go numb if he sits more than 2 to 3 hours (Doc. 6-1, p. 468/495). Guillory was 71 inches tall and weighed 228 pounds (Doc. 6-1, p. 469/495). Guillory has scattered maculopapular rash on his forearms, trunk, and lower abdomen/inguinal region (Doc. 6-1, p. 469/495).

Dr. Skweres concluded Guillory can sit for a full workday, but is unable to stand/walk for a full workday due to his reactive airway disease (Doc. 6-1, p. 470/495). Dr. Skweres further found Guillory can stand/walk for "reasonable amounts" of time without assistance (Doc. 6-1, p. 470/495). Dr. Skweres stated Guillory should avoid lifting/carrying objects over 20 pounds; should avoid strenuous activity; and should avoid hot/moist environments (such as working outdoors in the sun) (Doc. 6-1, p. 470/495). Dr. Skweres further stated Guillory's PTSD symptoms may limit his ability to interact with others if not treated properly (Doc. 6-1, p. 470/495).

Guillory also had a vocational assessment by Patrick Clifford, a "certified vocational evaluator" in July 2016, three days after the ALJ issued his decision (Doc. 6-1, p. 39/495). Clifford reviewed Guillory's medical file, found that Guillory's PTSD symptoms in 2015 described clinically significant distress or impairment in social, occupational, and other important areas of functioning (Doc. 6-1, p. 40/495). Clifford noted that Guillory was experiencing significant interruption in his daily routine activities due to frequent ongoing panic attacks and suicidal ideation that make it impossible for him to function on a reliable daily schedule without unexpected or anticipated interruptions (Doc. 6-1, p. 40/495). Clifford concluded that Guillory is unable to maintain substantial gainful competitive employment on a regular and consistent basis even at the sedentary level of work because it was highly likely that he would require frequent absences from work, excessive breaks during a workday, and accommodations to an extent that would not be tolerated by an employer (Doc. 6-1, p. 40/495). Clifford stated that it was his opinion, that Guillory, "within a high degree of certainty," had been unable to secure, follow, or maintain a substantially gainful occupation as a result of his service connected PTSD (Doc. 6-1, p. 40/495).

## C.    Administrative Hearing

At his April 2016 administrative hearing, Guillory testified that he lives in Welsh, Louisiana, with his wife and four stepchildren (Doc. 6-1, p. 48/495). Guillory testified that he finished high school, but did not go to a jobs program or trade school, and was not currently working (Doc. 6-1, p. 48/495). Guillory testified he last worked for Glenn Lege Construction and has not worked since November 12, 2014 (Doc. 6-1,

p. 48-49/495). Guillory testified that he receives V.A. disability of $ 1,968 per month (Doc. 6-1, p. 49/495).

Guillory testified that Glenn Lege Construction does road construction, laying asphalt and patching roads, and that he was a laborer who shoveled asphalt and flagged traffic (Doc. 6-1, p. 49/495). Guillory was also a cook in the Navy and the National Guard (Doc. 6-1, p. 50/495). In 2010, when he was activated, Guillory was sent to Iraq as a gunner (Doc. 6-1, p. 50 (Doc. 6-1, p. 334/495). Guillory admitted he lifted and carried up to 50 pounds as a Navy cook (Doc. 6-1, p. 50/495). Guillory explained that everyone in the kitchen helped unload and put away deliveries, and helped clean the kitchen after meals (Doc. 6-1, p. 51/495).

Guillory testified that his skin disorder began when he was in the Navy in 2003, and was caused by washing dishes (Doc. 6-1, p. 51/495). Guillory believes he has an allergy that causes his skin to dry up (Doc. 6-1, p. 51/495). Now, whenever he goes outside and starts sweating, he breaks out in boils and starts itching (Doc. 6-1, p. 51/495). Even taking a shower is difficult because he has to apply medication to do so (Doc. 6-1, pp. 51-52/495). Guillory applies his prescription cream and ointment as prescribed and gives them 5 to 10 minutes to soak in (Doc. 6-1, p. 52-53/495). No medicine has cured the problem (Doc. 6-1, p. 51/495).

Guillory testified that, when he was deployed to Iraq as a gunner in 2010, there were a lot of chemicals in the air (Doc. 6-1, p. 53/495). Guillory inhaled smoke and sand, which has caused some restriction in his breathing (Doc. 6-1, p. 53/495). Guillory testified that he used to be able to run two miles in 16 minutes, but now he

struggles to do so in 45 minutes (Doc. 6-1, p. 53/495). When Guillory lays down, it feels like someone is on his chest, and it is difficult to breathe (Doc. 6-1, p. 53/495). Guillory has two inhalers, one of which is an emergency inhaler and one is daily use (Doc. 6-1, pp. 53-54/495). Guillory tries not to exert himself often so he won't have to use the rescue inhaler because he does not want to depend on it (Doc. 6-1, p. 54/495). The last time Guillory used the rescue inhaler was two months before the hearing (Doc. 6-1, p. 54/495).

Guillory's PTSD causes him a lot of anxiety, depression, paranoia in crowds, agitation, and aggravation, and he stays "on edge" (Doc. 6-1, pp. 54-55/495). Guillory takes sertraline and clonazepam to help him control his PTSD symptoms (Doc. 6-1, p. 55/495). The medications keep him calm and help him think before he reacts (Doc. 6-1, p. 55/495). Guillory had been seeing a counselor every two weeks, but recently started going once a month (Doc. 6-1, p. 55/495).

Guillory testified that he gets up in the morning with the children before they go to school, and cleans the house, lets the dogs out, draws, and paints (Doc. 6-1, p. 56/495). Guillory cannot help with cooking because washing his hands a lot causes them to blister and peel (Doc. 6-1, p. 55/495). Guillory goes grocery shopping with his wife (Doc. 6-1, p. 56/495). He does not enjoy going anywhere by himself because he feels paranoid (like he is being watched) and very uncomfortable (Doc. 6-1, pp. 56-57/495). Guillory testified that, when he sleeps and dreams, the dreams are bad, but his Prazosin medication helps prevent nightmares (Doc. 6-1, p. 57/495). Guillory used to take a prescription sleep aid but it was discontinued because it gave him headaches

17

(Doc. 6-1, p. 58/495). Guillory can drive unless he took his medication, which calms him so much that his reaction time is impaired (Doc. 6-1, p. 57/495).

Guillory testified that he can stand/walk 20 to 30 minutes before he is hurting (Doc. 6-1, p. 58/495). Guillory can sit for 20 to 30 minutes before he has to stand up (Doc. 6-1, p. 59/495). Guillory can lift/carry 5 pounds frequently (Doc. 6-1, p. 59/495).

Guillory testified that he has "panic attacks" (sudden intense fear or sense of impending doom) that last an hour every couple of days (Doc. 6-1, pp. 59-60/495). His panic attacks are caused by "unsure environments" and loud noises (Doc. 6-1, p. 60/495). Guillory's panic attacks are worse than usual when he cannot solve a problem or is in a new environment (Doc. 6-1, 60-61/495). That occurs at least twice a week and lasts two hours (Doc. 6-1, p. 60/495). Guillory takes medication to help him not think about some of the things he experienced in the military (Doc. 6-1, p. 68/495).

The VE testified that Guillory's past work was: Navy mess cook (DOT 315.361-010, medium work, SVP 6); Navy seaman (DOT 911.687-022, heavy work, SVP 4); gunner in the National Guard (DOT 378.684-014, very heavy work, SVP 3); construction road laborer (DOT 869.67-026, very heavy work, SVP 2); and construction road flagger (DOT 372.667-022, light work, SVP 2) (Doc. 6-1, pp. 64-65/495).

The ALJ posed a hypothetical involving a person of Guillory's age, education, and work experience who is: limited to sedentary work; cannot be exposed to heat, fumes, odors, dust, gases, or work in a poorly ventilated space; must do unskilled

work; and cannot interact with the general public, although he may be around the general public and have incidental or superficial contact (Doc. 6-1, p. 65/495). The VE testified that such a person could work as a document specialist (DOT 249.5870918, sedentary work, SVP 2, 73,000 jobs in the national economy) (Doc. 6-1, p. 66/495). The VE further testified that if the person is off-task occasionally (up to one-third of the day), he would not be able to maintain employment (Doc. 6-1, p. 66/495). If a person arrived at work late or left early at least once a week, that person would not be able to maintain employment due to excessive absenteeism (Doc. 6-1, p. 67/495).

### D.    ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Guillory (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 514 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  See Greenspan, 38 F.3d at 237.

The ALJ found that Guillory has not engaged in substantial gainful activity since November 1, 2014, and has severe impairments of eczema, asthma, and anxiety/PTSD, but does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 6-1, pp. 16-17/495).  The ALJ also found that Guillory is unable to perform his past relevant work as a navy mess cook, Navy seaman, National Guard gunner, road laborer, or flagger (Doc. 6-1, p. 25/495).

At Step No. 5 of the sequential process, the ALJ further found that Guillory has the residual functional capacity to perform unskilled, sedentary work that does not require exposure to heat, odors, gases, fumes, or poorly ventilated areas, and does not require him to interact or communicate with the general public (Doc. 6-1, p. 19/495). The ALJ found that Guillory is a younger individual with at least a high school education and transferability of work skills is immaterial (Tr. pp. 24).  The ALJ concluded that there are a significant number of jobs in the national economy that Guillory can perform, such as "document specialist" (Doc. 6-1, pp. 24-25/495).  Therefore, Guillory was not under a "disability" as defined in the Social Security Act

at any time through the date of the ALJ's decision on July 25, 2016 (Doc. 6-1, pp. 25-26/495).

## II.     Law and Analysis

### A.     Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th

Cir. 1992). The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. See Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

**B.** **The Appeals Council did not err by not considering Guillory's new evidence.**

Guillory contends the Appeals Council erred in declining to review the ALJ's decision because Guillory submitted new and material medical evidence from Clifford Vocational Services that created doubt as to whether the ALJ's decision was supported by substantial evidence (Doc. 7).

In its decision to deny review, the Appeals Council stated that it had looked at the vocational assessment from Clifford Vocational Services dated July 28, 2016, which was *after* the ALJ's decision of July 25, 2016. The Appeals Council stated the July 28, 2016 vocational assessment was "about a later time" and "does not affect the decision" about whether Guillory was disabled on or before July 25, 2016 (Doc. 6-1, p. 5/495).

When a claimant submits new evidence to the Appeals Council, the Council must consider the evidence if it is "new and material" and if it "relates to the period on or before the ALJ's decision." See Sun v. Colvin, 793 F.3d 502, 511 (5th Cir. 2015) (citing 20 C.F.R. § 404.970(b)); see also Hardman v. Colvin, 820 F.3d 142, 150 (5th Cir. 2016).

22

Evidence is "new" if it is not cumulative and adds to the evidence already existing in the case.  See Bradley v. Bowen, 809 F.2d 1054, 1058 (5th Cir. 1987). "Materiality" is composed of two strands, relevance and probativeness.  See Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir. 1981).  To be relevant, the new evidence must relate to the time period for which benefits were denied and cannot concern evidence of a later acquired disability or subsequent deterioration of a previously non-disabling condition.  See Bradley, 809 F.2d at 1058; Johnson v. Heckler, 767 F.2d 180, 183 (5th Cir. 1985).  It is implicit in the materiality requirement that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition.  See Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994) (citing Haywood v. Sullivan, 888 F.2d 1463, 1471 (5th Cir. 1989)).

The Appeals Council clearly erred in concluding the vocational assessment did not concern Guillory's ability to maintain employment prior to July 25, 2016.  The vocational assessment was plainly based on the same medical records as was the ALJ's decision, and Clifford specifically discussed Guillory's ability to work in 2015. Therefore, the Appeals Council erred as a matter of fact in finding the vocational assessment of July 28, 2016 concerned a period later than July 25, 2016 and therefore, was not material.

However, the Appeals Council was correct in concluding that Clifford's report would not change the ALJ's decision.  Clifford titles himself as a "vocational evaluator."  Clifford is not a psychologist, and the Court is unable to determine

whether he is a licensed vocational rehabilitation counselor. It is noted that he does not refer to himself as such. There is no curriculum vitae attached to Clifford's report and his website does not include his educational background. Therefore, the Court is unable to accept Clifford as an expert in vocational rehabilitation and thus cannot give any weight to his report. See F.R.E. Rule 702.

Accordingly, the Appeals Council did not err in disregarding the report from Clifford Vocational Services.

III.    Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Guillory's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ.

P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this __30th__ day of January, 2018.

Joseph H.L. Perez-Montes
United States Magistrate Judge